ANDREW J. BUTLER *v.* J. B. MURISON & CO:

Where, upon the trial below, plaintiff offered as a witness, the Notary who protested the notes, to prove the facts connected with the tender of the collateral bonds, the defendant objected that the law required the Notary at the time of making protest of the notes, to state therein all the facts connected with the presentment for payment, and that the Notary could not testify to anything going beyond the protest, to modify or enlarge the same. *Held:* that the Notary was properly received to prove the facts as regarded the tender of the said bonds, notwithstanding nothing was said about it in the protest, or any statement made by Allen at the time, was a part of the res gestæ in connection with the tender.

Whoever takes a note after maturity, takes it subject to the equity between the original parties, existing previous to notice of transfer, and acquires no better right than the transferrer had himself; *aliter* if transferred before coming due.

To entitle the holder of a promissory note to recover against an endorser, on the ground of a promise to pay made after the latter had been discharged by failure to protest, the plaintiff must show that the promise was made by the endorser with full knowledge of his discharge.

APPEAL from the Sixth District Court of New Orleans, *Howell,* J. C. Roselius and J. Ad. Rozier, for plaintiff.

*Geo. S. Lacey, for defendants.*—Before directing your Honors' attention to other points, which fairly present themselves for consideration, we deem it not amiss, upon the threshold of our argument, to ascertain the light in which the testimony of Allen, sworn as a witness on the part of defendants, should be viewed by the Court.

Defendants's endorsements are prima facie evidence of their liability; and without proof destructive of the legal presumption thus created, that portion of the defence which rests upon want of consideration and fraud, must fall to the ground.

By whom could the facts, establishing that defence, be proved? By no one but by Allen himself. He alone, with the exception of Murison, was cognizant of the circumstances under which the endorsements were given; he alone, with the exception of Murison, knew that those endorsements were obtained by Allen, at his instance and request, and without consideration: and no one but Murison and Allen were aware of that unfortunate conversation at Chicago, which may be regarded as having entrapped the defendants into the heavy endorsements of $20,000 now sued on.

Defendants were compelled to take the testimony of Allen, or leave important and necessary facts unestablished, a valuable portion of their defence unmaintained. He was, therefore, not a witness of defendants' own selection, but one forced upon them; he was not their witness, but the witness of coercion.

In addition, the feelings and interests of Allen were on the side of the plaintiff.

Under such circumstances, in what light should his statements be regarded by the Court? Must they all be received as true; or can your Honors regard one portion of his testimony as contradicted by another portion, or by the evidence of other witnesses? Will this course involve the necessity of rejecting the whole? Or may the Court believe certain facts sworn to by Allen, and disbelieve others?

Greenleaf, in his work on Evidence, having laid it down as a general rule, that a party having presented a witness to the Court, is not permitted afterwards to impeach his general reputation for truth, or to impugn the credibility of the witness by general evidence, proving him to be unworthy of belief, proceeds to show that this rule finds an exception in cases where the party is forced to produce the witness; and declares, that under such circumstances, the party calling is permitted to go so far even as to impeach the general character of the witness, called by himself, for truth and veracity.

"But, however this may be, says Greenleaf, it is exceedingly clear, that the party calling a witness, is not precluded from proving the truth of any particular fact by any other competent testimony in direct contradiction to what such witness may have testified; and that, not only when it appears that the witness was innocently mistaken, but even where the evidence may collaterally have the effect of showing, that he was gener-

ally unworthy of belief. Greenleaf on Evidence, ¿ 443.

"If a witness state facts against the interest of the party that called him, another witness may be called by the same party to disprove these facts, for such facts are evidence in the cause, and the second witness is not called to discredit the first, but the impeachment of his credit is incidental only and consequential. The object of such evidence is to correct some supposed mistatement or to rectify an error; and if such evidence were to be excluded, the consequences would be most injurious to the administration of justice, as well in criminal as in civil cases. On the trial of an action, therefore, where the question was, whether the defendant's servant, who had been employed to sell a horse, had warranted him sound, and the servant on being called by the plaintiff, swore that he had not given any warranty, Lord Ellenborough allowed the plaintiff to call another witness, to prove that at the time of the sale, the servant had expressly warranted the soundness. There can be no rule of law, said Lord Ellenborough, by which the truth, on such an occasion, is to be shut out and justice perverted." Phillips on Evidence, vol. 1, p. 309; Cowen & Hill's Notes to Phillips on Evid., note 535.

"The principle which requires a party to abide by the whole of what his own witness has sworn to, or wholly to abandon it, is in the case of a witness being disposed, from interest or other cause, to withhold a fair account, subject to an exception; for there certainly is no testimony the veracity of which is less suspicious than the admission extorted from an unwilling witness; and it would materially prejudice the interests of justice, if a witness of this description could place the party producing him in the dilemma of either abandoning the benefit of the truth, which has with difficulty been obtained, or adopting all the falsehood which the witness may have the iniquity to mix up with it. The proper course seems to be, to regard the testimony of an unwilling witness in the same light as that of a witness adduced by the adverse party, respecting which; it is a settled principle, that you may believe what makes against his point who swears, without believing what makes for it. The rule that you must take the whole, or reject the whole, of your own witness' testimony, is by no means so unyielding as the learned commentator seems to suppose. In an ordinary case you may contradict your own witness as to one fact, and yet retain his testimony as to another." Cowen & Hill's Notes to Phillips on Evid., note 506.

"Where a party calls a second witness to contradict a fact which his first witness has sworn to, the whole of the first testimony is not therefore to be repudiated by the Judge. Thus, where in an action for a false return of nulla bona, the Sheriff's officer was called by the plaintiff to prove the receipt of the warrant and levy, who, on cross-examination, swore that no goods could be found, the plaintiff was allowed to contradict him as to the latter fact, but to retain his testimony as to the other." *Bradley* v. *Ricardo*, 8 Bing. 57.

"The Court is not bound to believe or disbelieve all that a party's witness says for or against him, but may reject such portions of his testimony against the party, as shall appear liable to objection." Per Livingston J. in *Stokes* v. *Mowatt*, 1; U. S. Law Journal, 305, 325–6.

We feel satisfied that your Honors will not limit your view to the fact, that Allen was sworn by the defendants, and on that account believe all that he may have said adverse to the interests of the parties who called him; or reject the whole, because a portion is objectionable; but that the Court, guided by the principles so clearly enunciated, and following the rule so unmistakably laid down in the authorities above cited, will retain such parts of Allen's testimony as appear to be true, and repudiate those liable to objection.

We ask then that this testimony be subjected to the closest scrutiny; analyzed and well weighed in all its parts; credited in that which is manifestly true, and discredited in that which may have been shown to be false, either by Allen's own statements, or the statements of another witness. This course pursued, truth will not be shut out, nor will justice be perverted.

We contend:

1. John B. Murison & Co. received no consideration for their original endorsements of the notes of the Chicago Refining Company, held by Allen; they were not, therefore, legally bound by such endorsements; and cannot, consequently, be regarded as liable upon the renewal endorsements sued on.

2. That the notes returned by Allen to the Chicago Refining Company, at the time of obtaining the notes sued on, had not been presented for payment at maturity; for want of due presentment Murison & Co., endorsers upon such notes, had been discharged from all liability on account of their endorsements of the returned notes; and, consequently, for want of consideration in endorsements sued on, they cannot be made liable upon the same.

3. The endorsements sued on were given in ignorance, on the part of defendants, of their discharge by want of presentment, from all liability upon their previous endorsements; and, having been given without full knowledge of such discharge, no liability attached.

4. At the time Allen obtained the endorsements in suit, he agreed with defendants not to hold them responsible as endorsers; or, he practiced circumvention in acquiring those endorsements. In either event, defendants are not bound.

5. Plaintiff acquired the notes sued on, after their maturity, and without having paid an adequate consideration for the same. Under such circumstances, the notes in his hands are subject to existing equities.

VI. At the time of demanding payment of the notes sued on, with a view to their protest, the negotiable bonds accompanying the notes as collateral security, were not tendered; a tender of the collaterals was ne-

cessary to constitute a due presentment of the notes ; and, in the absence of due presentment, the endorsers are discharged from all liability.

1. John B. Murison & Co. received no consideration for their original endorsements; they were not therefore legally bound by such endorsements; and cannot, consequently, be regarded as liable upon the endorsements sued on.

Did J. B. Murison & Co. receive a consideration for their original endorsement of the notes of the Chicago Refining Company, held by Allen ?

Gratitude, favor or affection, is not an adequate consideration. "Thus," (says Judge Story) " a note drawn by the maker, as a gift to a son or other relative, or to a friend, is not sufficient to sustain the note between the original parties.

Beneficence towards a public or eleemosynary corporation may, perhaps, be a sufficient consideration in law; and, if we are not mistaken, the Supreme Court of Louisiana so ruled in *Louisiana College* v. *Kellar*, 10 L. R. 164. But this doctrine has never been applied by the appellate tribunal of this State to a case like the present.

To constitute a valid consideration, in the sense of the law, it must consist either in some right, interest, profit or benefit, accruing to the party who makes the contract; or some forbearance, detriment, loss, responsibility, act, labor or service on the other side. Story on Promissory Notes, § 186.

It will not be pretended that defendants have derived the slightest benefit, right, profit or interest from their endorsement. Sould such pretension be made, it is at once disposed of by the testimony of Allen, who states that the endorsement was obtained by him ; that he paid nothing for the same; and that he is not aware that John B. Murison & Co. were in any manner benefitted by placing their names upon the back of the notes.

Did Allen exercise any forbearance, or was he subjected to any loss, detriment, responsibility, act, labor or service, by reason of defendant's original endorsements.

Counsel for defendants have twice or thrice examined the testimony of Allen, for the sole purpose of ascertaining what forbearance or loss, or detriment on the part of Allen, at the time of obtaining the original endorsements, has been shown; and he presents the following, as the only evidence touching that matter :

"I have been in the habit of loaning money to the Refining Company, of which Mr. Belcher was the President, through John B. Murison & Co., with their assurance that it was perfectly safe, and upon a statement of their willingness to endorse the paper at any time."

In reply to the following interrogatory, propounded by defendant's counsel, " What do you mean by your statement that John B. Murison &

Co. expressed their willingness to endorse the paper of the Company at any time ?" Allen answered, " This is what I meant" :

"When we were talking about loaning the company money, defendants made representations as to the solvency of the Chicago Refining Company; and stated their willingness to endorse the paper." * * *

"I do not know that their statement amounted to any more on the part of Murison & Co., than the mere expression of their entire confidence in the solvency of the Refining Company.

"But the statement induced me to lend the money to the company through them on their endorsement of the paper !"

"John B. Murison & Co. never entered into an obligation with me to endorse the paper of the company, which might issue in my favor."

We have aimed to transcribe in full the evidence of Allen, relative to the cause or consideration which induced him to lend his money to the company; and we think may safely assert, that the record discloses none other than the above.

Upon this testimony it is contended on the part of plaintiff, that Allen loaned his money to the Chicago Refining Company not only upon an express promise to endorse the paper at any time, which was one of the inducements for the loan, but upon their endorsements actually given at the time the money was loaned.

Did defendant's statement relative to a willingness on their part to endorse the paper, constitute an express promise ? And was it a legal inducement for the loan ?

Allen admits, in his testimony, that the statement amounted to nothing more than a mere expression of opinion on the part of the defendants as to the pecuniary responsibility of the Refining Company; and not only admits the fact, but expressly states " that John B. Murison & Co. never entered into an obligation to endorse the paper of the company, which might be issued." Their statement speaks for itself. It was explicit; readily understood by Allen; and meant nothing except an intimation of defendant's opinion of the pecuniary standing of the Refining Company. It did not assume the features of a legal obligation, nor bear the form of a naked, much less a legal promise to endorse; and if Allen was induced by this statement to lend his money, he was acting without warrant and in the absence of an inducement legal in its character.

If Allen sustained any loss or detriment from the acts or conduct of John B. Murison & Co,, connected with their endorsement of the paper, it must have arisen from some other cause than the loan of his money upon defendants' statement; or a promise on their part to endorse.

Seemingly aware that defendants statement did not amount to a promise to endorse, and formed no legal inducement for the advance or loan of his money, Allen not thinking of the difficulty in which he was becoming involved, in his testimony, hitches on to the statement the fact of an actual endorsement; and presents the latter as a motive or cause which, with

NEW ORLEANS, MAY, 1866.

A. J. Butler v. J. B. Murison & Co.

the statement or promise, induced him to lend his money to the Chicago Refining Company, He says : "The statement induced me to lend the money to the company, through John B. Murison & Co., on their endorsement of the paper."

We have already disposed of the statement. What of the fact of an actual endorsement ? Is it true that the $20,000, or any part of that amount, was loaned by Allen to the Refining Company upon their endorsements actually given at the time of the loan ? While Allen has made a clear and truthful statement, when swearing that the promise of defendants to endorse amounted to nothing more than a simple expression of opinion; has he not fallen into a most serious error in that portion of his evidence, wherein he says that he loaned the money "on defendants' endorsement of the paper ?"

A review of the facts of the case will show most conclusively that Allen did not lend his money upon the strength of defendants' endorsement of the notes of the Chicago Refining Company; and that, in this respect, his evidence is lamentably at fault.

The testimony of Allen, but more pointedly the admissions relative to Belcher's evidence indisputably prove that the $20,000 was loaned by Allen to the Chicago Refining Company, upon the notes of the latter, neither made payable to nor endorsed by John B. Murison & Co.; that the names of John B. Murison & Co. appear for the first time upon subsequent or renewal notes; and that the endorsements were then made at Allen's request, with the understanding that they were given "simply to facilitate Allen in the collection of the notes from the company, or, in other words, to induce the company, when seeing the names of their friends upon the paper, to be prompt in honoring the same.

"The first endorsement," says Allen, "whenever it was made, was made I think to facilitate the collection at my request." Subsequently he states "that he did not, to his recollection, in his intercourse and communications with J. B. Murison & Co., give them to understand that their names were on the paper simply for collection." The meaning of Allen, in these two statements, is not difficult to be understood. It is this : when John B. Murison & Co. endorsed the notes, which they did at my request, they so endorsed for the purpose simply of facilitating me in collecting from the company; but I have no recollection of having had any intercourse or communication with them subsequent to the endorsement, wherein I gave them to understand that they had endorsed, or in his own language, "that their names were on the paper solely for the purpose of collecting." He ignores, it is true, a subsequent recognition of the facts connected with the endorsements, but in no way weakens his previous statement, wherein he had said that the original endorsement, whenever made, was given not with the view of making defendants responsible as

endorsers, but for the purpose of rendering the collection of the notes from the company more prompt and easy.

If then, the money was loand by Allen to the Chicago Refining Company upon their notes, neither made payable to nor endorsed by defendants; if, moreover, their names appear for the first time upon subsequent or renewal notes ; and, in addition, it is shown that the first endorsements, whenever made, were given at Allen's request, solely for the purpose of facilitating him in the collection of the paper, and not with a view to defendants' liability as endorsers, how, we ask, can it be possible, under such circumstances, that Allen was induced to lend his money to the company, upon the strength of defendants' endorsements ?

It is evident that Allen did not loan his money, either upon defendants' promise to endorse, or upon the strength of the defendants' name, actually given, at the time of the loan; and in these respects he was not subjected to loss or detriment. In what other way did he exercise forbearance, or incur a risk, or loss or detriment ? What other responsibility has he assumed ? What act or labor, or service has he done, outside of advancing money to the Chicago Refining Company, upon the strength of defendants' promise, or their endorsements ? None other is pretended.

We think, then, we may safely assert, not only that defendants derived no right, interest, profit or benefit, from their original endorsements; but that, to obtain the same, Allen excercised no forbearance, and was subjected to no loss, detriment, responsibility, act, labor or service; and that such being the case, there was not an adequate consideration for such endorsements, in the sense of that word as used by law. Story on Promissory Notes, § 186.

The question then arises, if the original endorsements were given without consideration, were they binding upon defendants ?

"An obligation without a cause, or with a false or unlawful cause, can have no effect." C. C. 1887.

" By the cause of the contract, in this section is meant the consideration or motive for making it."      *      *      *      *      Civil Code, 1890.

"At common law (and the same rule pervades the Roman law and the foreign commercial law), a valuable consideration is, in general, necessary to support every contract, otherwise it is treated as a nude and void pact, nudum pactum ; and the maxim in such a case is, "ex nudo pacto, non oritur actio."

This rule is equally applicable, under certain limitations, to promissory notes, as it is to other contracts. And there must not only be a consideration, but, in the just sense of the law, it must be legal as well as adequate. Story on Promissory Notes, § 183. Story on Bills, § 185.

The consideration for a promissory note may be inquired into, and if there is no consideration for the promise, it is nudum pactum, and cannot be enforced by an action. *Schonmaker* v. *Rose*, 17 Johns. 301.

In an action between the endorser and endorsee, the consideration may always be inquired into, and the endorser cannot recover beyond the extent of the consideration actually paid. *Brock* v. *Thompson.* 1 Baily Bills, 322. Same case referred to in Chitty on Bills, edition 1842, p. 69.

Between the original parties, or holder, who has not given full value, the defendant may show that he received no consideration, or none that was, in point of law, adequate; and this will entirely defeat the action. Chitty on Bills, edition 1842, p. 69, § 70. Ibid. § 73.

There is no difference between a want and a failure of consideration, and each may now be set up as a defence, not only between the original parties, but also against a holder claiming by endorsement, after the note has become due, or taking it with knowledge of equities.

*Peason* v. *Pearson,* 7 Johns. 26. *Stone* v. *Wadley,* 3 ib. 124. *Ten Eycke* v. *Vanderpoole,* 8. ib. 120. *Deniston* v. *Bacon,* 10 ib. 198. *Woodhall* v. *Holmes,* 10 ib. 231. *Frisbee* v. *Hoffnagle,* 11 ib. 50. *Thatcher* v. *Dinsmore,* 5 Mass. 299. *Bayley* v. *Faber,* 6 ib. 451. *Slade* v. *Halstead,* 7 Cowen, 322. *Hill* v. *Bannister,* 8 ib. 31. *Moses* v. *Townsend,* 6 ib. 5. *Lawrence* v. *Stonington Bank,* 6 ib. 521. *Hill* v. *Buckminster,* 5 Pick. 391. *Thompson* v. *Hale,* 6 ib. 259. *Hampton* v. *Blakely,* 3 McCord, 469. *McCrearg* v. *Jagers,* ib. 473. *Nixon* v. *English,* ib. 549.

Plaintiff's counsel, seemingly aware of the futility of an effort to disturb the doctrine of nudam pactum, as applied to a promissory note, draws, or rather attempts to draw, a distinction between the note itself and an endorsement upon the note. This distinction is, evidently, one without a difference. If the holder of a note, obtained without consideration, cannot, on account of want of cause, recover from the maker, how can the holder of an endorsement, obtained by himself from the endorser, without adequate consideration, recover in an action upon that endorsement? As between the holder and the endorser, the endorsement obtained under such circumstances is not an accessary obligation, but an original contract; as much so as the note itself, between a maker and one to whom the maker has given his note.

In *Follain* v. *Dupré et al.* 11 Rob. 464, the Supreme Court of this State uses the following language :

"There is another principle well established, that if a party obtain an endorsement to a note by fraud, in himself, and transfers that obligation to an innocent third person, without notice, for a good consideration, in the usual course of business, that person can hold it and enforce payment."

In this case the Supreme Court drew no distinction between a note and an endorsement upon a note; and indirectly and virtually held that, if a party obtained the latter by fraud, he cannot recover upon the same. How then can one who has obtained an endorsement without considera-

tion be permitted to institute an action and recover upon such endorsement ?

Chancellor Kent disposes of this question in the following manner : " As between the original parties to negotiable paper, the provisions in favor of the bona fide assignee do not apply, and the consideration of the bill, note or check, may be inquired into. It may be inquired into between the maker and payee, and between the endorser and endorsee; the consideration of the endorsement also may be shown, for the latter are in this view treated as original parties." Kent's Com. vol. 3, p. 80. *Debras* v. *Forbes*, 1 Esp. N. P. Rep. 117. *Herrick* v. *Carman*, 10 Johns. 224. *Hill* v. *Buckminster*, 5 Pick. 391.

An intimation has been made, though not with sufficient boldness to entitle it to be noticed as a confident assertion, to the effect that the gift of a note or endorsement is a sufficient consideration, under the Code, to enable a party to whom such favor has been shown to recover in an action brought upon the note or endorsement.

We are at a loss to conceive upon what principle your Honors might act, in taking the present case out of the rules laid down by the Law Merchant, and determining it by the provisions of the Civil Code. Suppose, however, this course to be adopted, what evidence is there that the gift or donation of the endorsements in question was made in Louisiana ? Is such generous act on the part of J. B. Murison & Co. to be presumed, and this, too, in face of plaintiffs' allegation that the endorsements were given for a valuable consideration ? Is the donation or gift in the form required by law . Is it not subject to the right of revocation on the part of the donors ? Is not that revocation shown by a refusal to pay ?

The distinction drawn by plaintiff, between the notes and the endorsements upon the notes, cannot avail. Nor will he derive any benefit, should he attempt to overleap the clear guides established by the lex mercatoræ, and to step forward towards the povisions of the Code, regulating donations between the living. To this conclusion he must come at last, viz : the endorsements originally obtained by Allen from the defendants, were acquired without consideration, and are therefore not binding upon the latter.

If defendants received no consideration for their original endorsements, and were not, for that reason, legally bound by the same, can they be regarded liable upon the renewal endorsements now in suit ?

The answer to this interrogatory is almost self-evident. The hypothesis upon which the proposition rests being conceded, how can it be otherwise concluded than that no liability attaches ? Why should defendants be relieved from the payment of the first endorsements, and be held liable upon endorsements given in renewal ? What force or binding effect have the latter over the former ? Will it be said that the endorsements sued on are new promises, founded upon an obligation moral in its character ? Will it be urged that the defendants, although discharged from their form-

er endorsements, were still bound by the demands of conscience, and that this moral obligation formed a legal consideration for the subsequent undertaking ?

The Supreme Court of this State, in 7 Rob. 338, says that, under such circumstances, no moral obligation exists. And if it did exist, such moral or natural obligation, although coupled with an express promise, is not a sufficient consideration to support a bill or note between the parties. Story on Bills, § 185.

Thus far, in the argument of this cause, we have rested our defence upon the want of consideration in the original endorsements. We have contended that there was no consideration for such endorsements ; that, being without consideration, John B. Murison & Co. were not bound by the same; and, not being liable for the original endorsement, they cannot be held responsible upon the endorsements given in renewal and herein sued on.

We now propose, by way of argument, to undo much that we have done, to gainsay much that we have asserted; and, to admit, for the aforesaid purpose, that defendants gave their original endorsements, not only with a view of holding themselves liable as endorsers, but for an adequate consideration.

We then urge :

2. That the notes originally endorsed by defendants (or renewals thereof) were not, at their maturity, presented for payment; that, for want of due presentment, Murison & Co. were discharged from all liability; and, consequently, for want of consideration in the endorsements in suit, defendants cannot be made liable.

The facts, relative to a want of due presentment, are clearly shown by the admission of plaintiff's counsel, in reference to Belcher's testimony, fully set forth in the affidavit of Tisdale, filed upon application for continuance.

From this admission and affidavit, it appears that the notes originally endorsed by the defendants, or notes given in renewal thereof, matured in the spring of 1861; that they were not protested, nor even presentment for payment made; and there was no waiver of protest or presentment on the part of the endorsers, John B. Murison & Co.

Presentment at maturity was necessary, in order to fix a liability upon the endorsers.

The notes under consideration were foreign notes, and, in our opinion, protest of the same was required to rest a responsibility upon the shoulders of the endorsers. Be that, however as it may, a presentment at maturity was imperatively demanded.

"A presentment for payment is a condition precedent. In general, a creditor may sue his debtor without any previous demand; but, in the case of a negotiable instrument it is otherwise. There is, however, a material difference between the liability of the acceptor of a bill and

maker of the note, and that of the drawer and endorser; for, with respect to the first, though some presentment before action may be essential, he is not absolutely discharged; whereas, with respect to the drawer and endorser, they are discharged from all liability unless the bill or note be properly presented on the very day it ought to be." Chitty on Bills, § 353.

If no demand for payment be made of the maker, the endorser will be discharged. *Ins. Co.* v. *Shamburg*, 2 N. S. 511. *Franklin* v. *Verbois*, 6 La. 730. *Baggett* v. *Rightor*, 4 Rob. 18.

If, then, it be conceded that the notes maturing in the spring of 1861, were not presented at maturity for payment, and that for want of presentment, John B. Murison & Co. were completely discharged from all liability on account of their endorsement of such notes; and, in connection with this concession, your Honors take into consideration the fact, well established by the testimony of Allen, that the endorsements above alluded to were the only foundation and cause for those sued on, then it may be safely asserted that the defendants, for want of an adequate and legal consideration to support their new promise or obligation, cannot be made liable upon the same. The latter is, in this view of the case, as well as when considered as resting upon endorsements, themselves without consideration, which formed the subject matter of our first proposition, a nudum pactum, from which, non oritor actio. *Heath* v. *Commercial Bank*, 7 Rob. 338.

"The undertaking of the endorser was to pay the bill, provided the holder made due demand of the acceptor, and gave him due notice of the non-acceptance of the bill. The obligation was, therefore, a conditional one; when the condition failed he was under no obligation, either natural or civil to pay the bill. He was completely and entirely discharged."

Suppose, however, the question of consideration, or rather want of consideration, as above discussed, is not a legitimate subject for investigation; nay, more, admitting, for present purposes, consideration to the fullest extent, what then ? Are the defendants without defence to the present action ? Clearly not.

They maintain :

3. That the endorsements sued on were given without knowledge on the part of defendants of their discharge, by want of presentment, from all liability upon their previous endorsements; and, having been given in ignorance of such discharge, no liability attached to the endorsements in suit.

The record fails to disclose any evidence showing that the endorsements in suit were given by John B. Murison & Co. with their eyes open to the fact of a prior discharge. On the contrary, it appears from the testimony that Allen, so far from communicating this important and sacramental knowledge to Murison, gave him to understand that the old notes were still in legal existence, with the old endorsements binding

upon the defendants. He says, "that at the time of the endorsement, Murison shrugged his shoulders and said: Captain Allen, I do not like to do this. Whereupon he replied: Very well, Mr. Murison, the old notes will do me; and then he, Murison, endorsed them."

Murison was well aware that the original endorsements had been given without consideration, and simply to facilitate Allen in the collection of the paper; and, consequently, when called upon for new endorsements, he was surprised, and evinced a hesitation to endorse; a hesitation which, under other circumstances, would not probably have occurred. But, when told by Allen that the old notes would be held over him, and he realized the fact that he might be subjected to a liability he had never intended to incur, he shrugged his shoulders, and endorsed the names of John B. Murison & Co. upon the back of the notes. Allen carefully refrained from informing Murison that his firm had been discharged from their prior endorsements; he made no allusion to the want of presentment, and the want of protest; he carefully concealed the laches of which he had been guilty, connected with the notes maturing in the Spring of 1861; and went even so far as to assert that the old notes still existed, with full recourse against John B. Murison & Co., as endorsers upon the same.

The fact of ignorance, on the part of defendants, cannot be denied.

The renewal endorsements sued on, having been given without full knowledge by defendants of a discharge from their previous endorsements, no liability attached.

"Admitting, says Carleton, J., that the defendants assumed payment of the note, which is by no means clear, it does not appear that they did so with a full knowledge that they were discharged from liability by want of notice. It must be shown that they were not ignorant of their rights, or they would not be bound." *Briggs* v. *Briscoe*, 12 La. 468; *Williams* v. *Robinson*, 13 La. 421; *Glenn* v. *Thistle*, 1 Rob. 572.

"We have always held, says Judge Martin, in regard to subsequent promises to pay, that the plaintiff is bound to prove that the defendant had knowledge of the irregularity when he made the promise. *Tomes* v. *Montagne*, 2 Rob. 158.

"Counsel for the Bank does not pretend that there was a legal protest; but maintains that the liability of defendant results from his having solicited and obtained indulgence from the Bank. This would be true, if knowledge of defendants' discharge, by the informality alleged, could be shown. In the absence of any proof of his knowledge of the circumstances which liberated him, the claim of the Bank cannot be sustained." *Bank of Louisiana* v. *Holmes*, 10 Rob. 40; *Commercial Bank* v. *Perry*, 10 Rob. 61; *N. O. Savings Bank* v. *Harper*, 12 Rob. 231.

"If, under the evidence, this could be considered as a subsequent promise to pay, it was incumbent on the plaintiff to show that it was made by the defendant with the full knowledge of his discharge. No

such proof has been adduced; but, on the contrary, we are satisfied from the evidence that Briggs was ignorant of his discharge at the date of the waiver."

The judgment of the District Court, releasing Briggs from all liability upon a subsequent promise to pay the note, on the ground of his ignorance of a discharge from his endorsement, was accordingly affirmed by the Supreme Court of the State. *New Orleans and Carrollton Railroad Company* v. *Mills*, 2 An. 824.

In the authorities to which we have referred your Honors, the subsequent promise from which the endorser was relieved, on account of want of knowledge was, it is true, a simple parol promise to pay ; while in the present suit the promise of defendants assumes the form of endorsements.

We submit, however, to your Honors that the cases cited are applicable upon principle; the principle involved being readily ascertained from a perusal of the authorities, and if thus applicable it is wholly immaterial whether or not facts be identical. It argues a weak mind, to be constantly searching after an identity of facts and losing sight of that unity of principle, which alone gives to judicial decisions the weight of authority.

If John B. Murison & Co., without full knowledge of a discharge from their previous endorsements cannot, as we have seen from a long and unbroken line of authority, be held responsible upon a simple parol promise to pay, why should they be made liable upon a promise reduced to writing ? Why subjected to legal responsibility, because that written promise assumed the form of a promissory note held by an original party? Why liable, because at the request of Allen, and while in ignorance of existing facts which Allen, the holder of the old notes, was bound to communicate to them, they, without any new consideration to support the promise, endorsed certain notes instead of making them ? If error, the principle underlying the authorities above quoted, operates a discharge from a verbal assumpsit, why is it not a ground for relief against a written promise, or a note, or an endorsement ? The form in which the new obligation may be clothed is wholly immaterial. It is a matter of no moment, whether it be given by parol or in writing; in the form of a note or bill; or as an endorsement. As evidence of what was done, a written promise doubtless possesses greater weight than one by parol, and that weight may perhaps be increased, if the obligation assumes the outward form of a note or an endorsement; but the legal liability of a party is no greater in one case than in the other.

In *Garland* v. *Salem Bank*, the endorser had gone even further than giving a new note or endorsement. He had actually paid the amount of the endorsement to the holder of the note, and still he was permitted by the Supreme Court of Massachusetts to recover back his money.

In this case it was held that where the endorser of a promissory note,

ignorant that a demand had not been made on the maker of the note, paid the amount thereof to a banking company, with whom it had been left by the holder for collection, and the same had been passed to the credit of the holder in the books of the company, the endorser might recover the money from the company, although after the reclamation they had paid the amount to the order of the holder. 9 Massachusetts, 410.

In *Union Bank of Louisiana* v. *E. D. Hyde et al.*, it appears that about the 8th day of November, 1836, T. R. Hyde & Bro., being the holders of several promissory notes, amounting to $2,748 08, did, at that time, and on the 6th of December, discount said notes in the Union Bank, whereby the bank became owners of the same. That they were by the bank remitted to the State of Mississippi, where 'they were made payable; but not being paid at maturity, were returned to the bank, and, on their demand, taken up and settled by the endorsers, T. R. Hyde & Bro., "who believed the said notes to have been protested, notified, etc., when in truth, and in fact it was not so." In this settlement, the bank obtained two promissory notes, drawn by E. D. Hyde & Co., and endorsed by T. R. Hyde & Co.; and it was upon T. R. Hyde & Co's endorsement of these new notes that the bank commenced suit. The Supreme Court of this State rendered judgment against the endorser. But upon what ground? Was it because the endorsers, by endorsing new notes, had precluded themselves from urging their discharge from a previous liability, by want of a due demand of the old notes? Was it because the Supreme Court refused to apply to that case the rule of law which had been made, often and again, to apply to a simple promise to pay? Clearly not. But, because, under the circumstances of that case, the Court presumed that T. R. Hyde & Bro. were aware at the time of giving their new endorsements, that they had been discharged from all liability for the old. Had not the facts of the case warranted that presumption, the opinion of the Supreme Court of this State, would have been rendered expressly in accordance with that given by the Supreme Court of Massachusetts, in *Garland* v. *Salem Bank*. Inferentially it is the same. Rob. 418.

*Heath* v. *Commercial Bank of New Orleans*, was an action brought to recover back money which the plaintiff alleged was paid through error, by his agent, under the belief that as endorser of a bill of exchange, held by the defendants, he was bound, when in point of fact he was not so bound, and had been discharged by the failure of the holder of the bill, to give notice of its dishonor for want of acceptance.

The Court says: "Nothing is better settled than that a subsequent promise to pay, to be binding on an endorser, who has been discharged by the holder's laches, must be made with a full knowledge of such laches, and with an intention to waive his legal rights. * * * * * * A promise thus made in ignorance of the facts which discharges a party,

28

is not binding; and money paid under it can be recovered back. There was not on the part of the endorser even a natural obligation to pay, which precluded him from recovering back the amount paid." 7 Rob. 337.

If an endorser, who has been discharged by the laches of the holder, can recover back the amount of an endorsement by him paid, why cannot he successfully resist the attempt of a holder guilty of laches, who seeks to enforce payment of a note or endorsement given in error?

If then it be true, as we have conclusively shown, that the endorsements in suit were given by defendants to Allen at his request, and in ignorance of Allen's laches; and it is furthermore true, that endorsements obtained under such circumstances, are without binding force or effect, then there is an end to plaintiff's action, and defendants without going further are entitled to a judgment at the hands of the Court.

4. At the time Allen obtained the endorsements in suit, he agreed with defendants not to hold them responsible as endorsers; or he practiced circumvention in acquiring their endorsements; in either event defendants are not bound.

Allen says : "After Murison had made the endorsement, he said to me, 'you must not hold me responsible, because, if I should have to pay the note, it would ruin me.' My reply was, 'pshaw ! Mr. Murison, you are always borrowing trouble and pay interest for it.' This statement was made when he got up, immediately after the endorsement of the paper."

In order to place a correct interpretation upon this ambiguous language of Allen, and to arrive at his meaning it will be necessary for your Honors to bear in mind antecedent facts.

Defendants had endorsed, at the request of Allen, certain notes of the Chicago Refining Company; their endorsements having been given without consideration, and simply for the purposes of collection; these notes had matured; a settlement with Belcher had been made, and new notes given. Murison was asked by Allen to endorse the new notes, and he hesitated. Allen threatened Murison with the old notes, when the latter, not knowing to what legal liability he may against his will have subjected the firm, was determined to remove all doubts for the future; and then in unmistakable language he remarked : "Capt. Allen, you must not hold us responsible on account of these endorsements." Allen replied : "Pshaw ! Mr. Murison, you are always borrowing trouble and paying interest for it." Did he say to him as he would and should have done, had he not intended to assent : "No, Mr. Murison, if you endorse that paper, you will subject John B. Murison & Co. to the responsibility of endorsers?" Did Allen even disclaim Murison's proposition of a want of liability ? Did he not withhold a necessary explanation, and under such circumstances does not the law infer assent on the part of Allen ?

"If doubt or obscurity arise," says the Code, "for the want of ne-

cessary explanation, which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee." C. C. 1953.

Again : "It is the common intent of the parties that is to be sought for; if there was a difference in the intent, there was no common consent, and consequently no contract." C. C. 1940; No. 4.

Murison clearly intended that the endorsements should not subject defendants to a legal responsibility, and so stated to Allen. He was w.lling that the names of John B. Murison & Co. should be placed upon the back of the notes, for the purpose of facilitating their collection, or perhaps for any other purpose short of a liability on the part of the defendants as endorsers; but this responsibility he was not willing to assume, and so declared at the time of endorsing.

This conditional endorsement was a part of Murison's agreement, and Allen must be regarded as having assented to it, or the endorsement, under Article 1940 became void for want of a common consent to the terms upon which it was given.

The fact that Allen did not, in reply to Murison's proposition, positively disclose his intention to hold defendants liable to the responsibility of endorsers; his neglect even to disclaim the idea of want of liability; the provisions of the Code which place upon Allen's language a construction most favorable to the other party; and the want of a common consent destructive of all agreement, which would be the case if Mr. Murison's clear and unmistakable proposition was rejected by Allen, all point, with unerring certainty, to the fact of a consent on the part of Allen, though clothed with ambiguous language not to hold defendants responsible as endorsers.

We have been disposed to look at Allen's language from this stand point; a stand point in consonance with reason, sustained by law and equity, and withal violating no rule of common charity. If, however, plaintiff's counsel will not permit him there to rest; if to his language they refuse to give an interpretation so just and proper, they force Allen to a position strongly tainted with circumvention and fraud.

Discarding the idea of an assent, to the simple and precise understanding disclosed by Murison, Allen's language develops Allen's thoughts and plan as follows :

Murison has plainly stated to me, that when endorsing the notes, he did not consider the firm of J. B. Murison & Co. liable upon such endorsements. If I do not appear to assent, he will withhold the endorsements, and I will be thrown back upon the notes of the company, with all recourse against J. B. Murison & Co. gone; whereas, if I openly consent, how can I hereafter claim to have recourse against J. B. Murison & Co ? What shall I do ? I will use ambiguous language; I will quiet the fears of Murison; I will lull him into the belief that his proposition is assented

to; and after I have obtained the endorsements, I will throw myself back upon my obscure language, which has not conveyed, but concealed my idea and my intention, and will force payment of the endorsements. Is conduct like this frank and open, and honest ? Does it savor of a good or an evil intent ? Was it not the work of circumvention and fraud ? "Frans latet in generalibus." Fraud lies hid in general expressions.

If the endorsements were given with the express understanding that defendants, the endorsers, should not be liable, no liability of course attached. Such was the contract, and by it parties must abide. Are they responsible if the endorsements were obtained by circumvention or fraud ?

A bill of exchange or note will be void, where it is founded in fraud or duress, or imposition or circumvention, or taking an undue advantage of the party. And the doctrine is so completely coincident with the dictates of natural justice, that it probably has a full recognition in the jurisprudence of every civilized country. Certain it is that it has a most perfect sanction in the Roman Law, and in the jurisprudence of all the States of continental Europe. Story on Bills, § 185, p 215; Story on Notes, § 188, p. 213; Pothier on Obligations, N. 28 to 33; Pothier by Evens, vol. 2, No, 2, pp. 7 to 25; Ib. No. 3, pp. 28, 9; C. C. Art. 1813.

5. Plaintiff acquired the notes sued on after maturity, and without having paid an adequate consideration for the same; under such circumstances the notes and endorsements are in his hand, subject to existing equities ?

Did not plaintiff acquire after maturity ?

This is admitted in his answer to interrogatories upon facts and articles. Plaintiff says that he obtained the notes after they had been protested.

Did he pay to Allen an adequate consideration for the paper ?

At the time of the purchase of the notes John B. Murison & Co. were, and had been for years previous, merchants of the highest standing in the city of New Orleans. They met their liabilities with promptness, and never suffered their paper to go to protest. The members of that firm were men not only of probity but of property; and their responsibility to the full extent of the notes held by Allen was beyond question. In addition to this security, Butler held in his hands twelve thousand dollars, monies belonging to defendants arising out of an adventure in cotton, in which Butler and they were mutually interested. And yet plaintiff pretends to have given Allen for the notes thus secured, and further secured by collaterals, only sixty per cent. upon the face of the paper, exclusive of interest; a sum exactly equal to the amount of defendants monies in plaintiff's hands; this sum, inconsiderable and inadequte as it was, being covered by a pretended letter of credit not used by Allen at the time of his giving testimony; liable to be revoked, and possibly countermanded and revoked at the present time.

Is this an adequate consideration in the sense of the law?

Under such circumstances Butler acquired the notes and endorsements, subject to equities.

There were equities against the endorsement in Allen's hands. He had obtained the same from Murison & Co. without consideration, and with the understanding that defendants, in endorsing originally, and subsequently endorsing the notes in suit, were not to be held liable as endorsers. Allen, clearly, could not as we have shown, recover upon endorsements thus obtained. He could not enrich himself at the expense of those with whom he had thus transacted. And by transferring the notes to plaintiff after maturity, or without a valuable consideration, he simply placed the latter in his shoes; giving him no rights and privileges which did not appeartain to himself; subjecting the plaintiff to the infirmities of Allen's title, and causing the paper in Butler's hands to existing equities and defences, of whatever nature the same might be. Vide numerous authorities cited in Hennen's Digest. Verb. Bill and Notes, pp. 189, 190.

What object has the law in view, in forcing the holder of a note to an actual presentment of the same? Why is his duty so peremptory, that he must, where it is possible, have the note in his possession, actually exhibit it, and be ready to deliver the same to the maker when the demand for payment is made? This legal requirement is not arbitrary, but is founded upon a motive. What is the reason or grounds for this determination? Manifestly none other than to relieve the maker or endorser of a note from the risk of a double payment. For all other purposes a simple demand for payment, without exhibiting the note, would suffice; but if a demand for payment without exhibition of the note would be sufficient in all cases, the maker and endorser being required to pay the amount of the note upon this demand, might, in so doing, subsequently be compelled to take up the paper which, previous to its maturity, had found its way into the hands of a bona fide holder. We take it for granted that to relieve the maker and endorser from the risk of a double payment, is the reason why the law requires the actual exhibition of the note at the time payment is demanded.

In order to protect the maker of a note secured by negotiable collaterals from this risk, it is equally necessary to require at the time of demanding payment of the note, a tender of such collaterals.

In absence of due presentment of the notes to the makers at maturity, defendants were discharged from all liability as endorsers. Due presentment, condition precedent. Story on Bills, § 344.

In the original brief, filed on the part of defendants and appellants, we contended:

That the endorsements sued on were given by John B. Murison & Co., not only without consideration, but in ignorance, on the part of the defendants, of their discharge from liability upon the returned endorse-

ments, occasioned by the laches of Allen.

That this want of consideration, and ignorance of irregularities, operating a discharge, relieved defendants from all responsibility to Allen.

And that Butler, having acquired the notes from Allen, after dishonor, holds them subject to all equities which might have been urged against the paper in the hands of the transferror.

The questions of fact involved in this argument were shown by us to be clearly established by the evidence; and we are not a little surprised to discover a well settled rule of commercial law so boldly assailed by counsel for appellee.

We propose briefly to notice the argument of counsel for appellee upon this point of law.

He contends that the defence of want of consideration, arising from accommodation paper, though valid as against Allen, is without effect against the transferree, Butler, even though the latter acquired after protest.

"In the suit of *Brown* v. *Mott*, says counsel (7 Johnson Reps. p. 362), it is laid down. The cases of *Smith* v. *Knox*, 3 Exp., N. P. 46, and *Charles* v. *Marsden*, 1 Taunton, 224, show that the principles of commercial law are, that where there is no fraud in the case, and the endorsee has given value for the bill, he shall recover of the acceptor, notwithstanding the bill was accepted without consideration, and for the accommodation of the drawer, and that fact was known to the endorsee when he took the bill, and though he even took the bill after it was due."

Counsel for plaintiff also refers to Parsons on Mercantile Law, pages 102, 103: "Nor is the mere want of consideration between payee and maker one of those equities to which a holder for value, after dishonor, even with notice, is liable, provided the bill or note was originally intended to be without consideration, as in the case of an accommodation bill or note, intended as a gift."

In replying to these authorities, and to the argument of counsel resting upon the same, we have to say:

1. That the rule supposed to be laid down in the authorities quoted by counsel has not been accepted and acted upon as the established rule of commercial law; particularly in the State of Louisiana, where, by the decisions of the Supreme Court, a contrary principle has been uniformly recognized and sustained.

"As no one is a bona fide holder, in this sense, who has notice of a defence against the paper, no one who takes it after dishonor is such bona fide holder, because the dishonor itself is notice to him that there is some defect or defence. Hence the rule that, "one who takes paper for value, after dishonor, is open to all equitable defences." Parson's Notes and Bills, edition 1865, vol. 1, p. 275.

Your Honors will perceive that this commentator makes no distinction between notes and bills, given with or without consideration, and as ac-

commodation paper or otherwise, where the same is taken after maturity; but lays down the rule generally, that one who takes paper for value, after dishonor, is open to all equitable defences.

"If the paper be taken after it is due and payable, the presumption is against the validity of the demand, and the purchaser takes it as a dishonored bill, at his peril, and subject to every defence existing against it before it was negotiated." Kent's Commentaries, vol. 3, p. 90 (6th edition).

"If the transfer is after the maturity of the note, the holder takes it as a dishonored note, and it is affected by all equities between the original parties, whether he has any notice thereof or not." Story on Notes, p. 203.

"But a man who takes a bill after it is due, takes it subject to all the objections and equities to which it was liable in the hands of the person from whom he takes it." Bailey on Bills, chap. 5, § 3, 82 (ed. 1826). Bailey on Bills, chap. 5, § 3, p. 162 (ed. 1830). Chitty on Bills, chap. 7, p. 243 (ed. 1833).

"A person who takes a dishonored bill, cannot be allowed to claim the privileges which belong to a bona fide holder, without notice. If he chooses to receive it under such circumstances, he takes it with all the infirmities belonging to it, and is in no better condition than the person from whom he received it." *Andrews* v. *Pond et al.* 13 Peter's Reports, p. 66.

"In a suit between accommodation endorsers and their endorsee, with notice of the fact, actual or constructive, the consideration may be inquired into." *Brown* v. *Fort & Giraud*, 1 Martin, 34.

"This suit is brought against the succession of C. D. Jordan, to recover the amount of five promissory notes drawn by Jordan, Ellis & Co., to the order of Henry Jordan, and endorsed by said Henry Jordan, C. D. Jordan and Thomas K. Jones & Co. successively. The plaintiffs allege that they are holders by endorsement from T. K. Jones & Co., and that C. D. Jordan, the defendants' testator, is liable to them as endorser."

"The defence set up is, that C. D. Jordan endorsed the notes for the accommodation of T. K. Jones & Co., at their special request, in order to enable them to raise money at bank in Boston, and under a positive assurance that he should never be liable as endorser. It is further alleged, that the plaintiffs are not the bona fide holders of the notes sued on, and that they were received by them long after they were due, in order to enable them to recover for the benefit of T. K. Jones & Co., who took up the notes at their maturity, after failure of the makers to provide for their payment. It is further alleged, that the notes were given by Jordan, Ellis & Co., for goods sold them by T. K. Jones & Co., and that C. D. Jordan received no consideration, to the knowledge of the present plaintiffs, who became possessed of the notes, not in the usual course of trade, but after they were due and dishonored."

"It was held that where an endorser endorsed for the accommodation of the holders, without receiving any consideration whatever, they cannot recover against him; nor their endorsee, who takes the note after its dishonor." *Whitwell et al.* v. *Crehore, Ext.* 8 La. 540.

"Where the holder of a note receives it from the payee after its maturity, he is considered as standing in the place of the payee, and it is subject to any defence which might have been urged against the payee, and if there was a failure of consideration he cannot recover." *Sawyer* v. *Hoovey et al.* 5 A. 153.

"A party receiving a bill of exchange after maturity, is subject to any equities existing between the original parties." *Conery* v. *Kendall,* 5 A. 515.

In *Matthews* v. *Ruthorford,* 7 An. 225, the attention of the Supreme Court of Louisiana was especially and pointedly directed to accommodation paper, and in that case it was negatively held that an accommodation maker is not liable to a holder, who takes the note after maturity.

It might well be held that the holder of accommodation paper, acquired before maturity, even with notice, could not be defeated in his claim upon the paper, by the plea of want of consideration; for, as the Supreme Court says, in *Matthews* v. *Ruthorford,* "the very object of an accommodation note is to enable the payee, by a sale or other negotiation of it, to obtain a credit with third persons for its amount."

But this principle cannot be made to apply, nor has it been applied by any other authorities than those quoted by counsel, to a case where accommodation paper has been taken after dishonor; for the reason that the party, after maturity, does not hold himself out to the public, as absolutely bound. He cannot be regarded, after the bill or note is stained by a protest, as intending to give his name, as an accommodating party or otherwise.

LABAUVE, J.    This suit is brought to recover of the defendants $20,000, evidenced by four promissory notes, each for $5,000, with ten per cent. interest from the 23d July 1861, under the laws of the State of Illinois, where they were executed, and made by the Chicago Refining Company to the order of and endorsed by E. S. Hunter; John B. Murison & Co. are the endorsers.

It is alleged in the petition, that said notes are signed by E. S. Hunter, the Treasurer, and countersigned by H. W. Hunter, the Secretary of the said Company, being the proper persons to execute the same, and having the authority to do so.

That afterwards, the said payee endorsed the said four notes in blank, and then afterwards the said John B. Murison & Co., defendants and commercial partners, endorsed the said notes in blank, and delivered the same to petitioners.

The answer admits the signatures to, and the endorsement of defend-

ants upon the four notes referred to in the petition, but denies every other allegation in the petition contained.

It further states, as a special defence, that the endorsement of defendants was made and given at the special request of one James F. Allen, who had obtained the said notes from the makers, and, at the time of the endorsement by respondents, owned and held the same; that when these defendants made their endorsement, it was fully agreed by these appearers and the said Allen, that the said endorsement was merely nominal, and that these respondents were not in any event, to be regarded as liable for the payment of said notes. That respondents have, at no time, received either legal, equitable or moral consideration for their aforesaid endorsement, and that the same is nudum pactum.

That the plaintiff has acquired possession of said notes from said Allen, without consideration, out of the usual course of business, at a time and under circumstances sufficient to induce a reasonable belief of the existence of equities and defences against the paper.

That said notes were not duly protested, nor legal notice given to these appearers. The answer specially denies that, at the time of the demand of payment by the notary with a view to a protest, the bonds and coupons of interest, were by the notary or any other, returned, offered, or presented to the makers of said notes, to the payee or to these respondents, as required by the endorsement or agreement on the back of said notes.

Upon these issues the lower Court, after having heard the testimony, gave judgment in favor of plaintiff, and the defendants took this appeal.

Upon the trial below, plaintiff offered as a witness, the notary who protested the notes, to prove the facts connected with the tender of the collateral bonds; the defendant objected that the law required the notary at the time of making protest of the notes, to state therein all the facts connected with the presentment for payment, and that the notary could not testify to anything going beyond the protest, to modify or enlarge the same. The notary was properly received to prove the facts, as regarded the tender of the said bonds, notwithstanding nothing was said about it in the protest, or any statement made by Allen at the time, was a part of the res gestæ in connection with the tender. The Court did not err in receiving the testimony.

On the trial, the defendants offered the depositions of James F. Allen to prove that, at the time of the endorsement by said defendants, it was agreed between defendants and said Allen, that said endorsements were merely nominal, and that said defendants were not in any event to be held liable for the payment of said notes; the plaintiff objected on the score of interest in the witness, and that no parol testimony could be received to prove that the endorsement on the notes was made under any conditions.

The Court overruled the objections properly. The notes had been

29

transferred by Allen to the plaintiff after due and protested; if Allen had any interest it was against the defendants, because if he had transferred to plaintiff a vicious paper, he was certainly responsible to him, (19 L. 472), and the agreement also between the defendants and Allen, followed the notes in the hands of plaintiff, who acquired nothing but the rights of Allen.

On the trial below, it was admitted by the plaintiff that if W. H. Belcher was present (Belcher was the President of the Chicago Refining Company), he would swear that the notes sued upon commenced by the loan of a certain sum of money to the Chicago Refining Company by one James F. Allen; that to cover their first loan, the Company issued their promissory notes in favor of said Allen, and that said notes were neither payable to or endorsed by J. B. Murison & Co.; that said J. B. Murison & Co. did not at any time, endorse any of the notes at the request of the Chicago Refining Company; that the endorsement of J. B. Murison & Co. appeared for the first time upon subsequent renewed notes; that the Company paid them no consideration for such endorsement, and that the endorsement, whenever made, was made at the instance and request of other parties than the Company; that at the time of the making and giving to said Allen, the notes sued upon, the notes returned to the Company, and which formed the sole and only consideration of the notes now in suit, had been for two or three months over due and not protested, and without presentment for payment at maturity, and that presentment for payment at maturity had not been waived or in any manner dispensed with; that at the time of the settlement of the returned notes and the giving of the notes in suit, it was fully understood and agreed by and between Allen and the said Belcher; that the old and returned notes aforesaid, were settled and fully and completely extinguished by the notes of the Company sued on, secured by certain bonds handed over to Allen as collateral security for their payment; that the settlement and extinguishment of the old notes, was made without the slightest reference to the endorsement of J. B. Murison & Co. upon the notes sued on; that such endorsement of J. B. Murison & Co. formed no part of the agreement and settlement aforesaid, and that said settlement and extinguishment was perfect and complete without such endorsement.

J. J. Allen, the original holder of said notes, and who transferred them to the plaintiff, testified in substance as follows :

I sold to A. J. Butler four notes of hand of $5,000 each, and I believe that they are in suit in the Sixth District Court of this city.  *  *  *  If my memory serves me right, I received four notes in suit by Col. Butler, from the Chicago Refining Company, on the 23d day of August, 1861. In giving the notes, the Chicago Refining Company was represented by William H. Belcher, as President.  The four notes in suit were given in place of other notes of the Company, held by witness.  *·  *  *  *  *

In the summer of 1861, I went to Chicago in company with Mr. Murison

for the purpose of making a settlement of four notes of $5,000, each past due. The notes were given by the Chicago Refining Company, payable to the order of and endorsed by John B. Murison & Co. I held no collaterals for the payment of these notes, except the endorsement of John B. Murison & Co.; W. H. Belcher, on behalf of the Chicago Refining Company, made an arrangement and settlement with me of the old notes which I held against the Company. They did give me new notes for the four old ones. These notes are the same notes which are in suit in the Sixth District Court.

He gave me, as collateral security for the payment of the notes, twenty bonds of one thousand dollars each, of the Chicago Refining Company; he did not offer me Mr. Hunter's endorsement, but I solicited it; he did not tender Mr. Hunter to me as an endorser of the Company; I solicited him and obtained him. * * * From the time I received the bonds I kept control over them until I delivered them to Col. Butler, when I sold him the notes.

I have been in the habit of loaning money to the Refining Company, of which Mr. Belcher was the President, both at St. Louis and Chicago, through John B. Murison & Co., with their assurance that it was perfectly safe, upon a statement of their willingness to endorse the papers at any time, which they did; I never knew Mr. Belcher before I went to Chicago, and then, through Murison & Co. This is all the consideration for the endorsement of the four notes sued upon, so far as I know. I only know that they done business for Mr. Belcher—were his agents. I never paid to them anything for their endorsements on the four notes. The first four notes (the original notes before mentioned) were given for money, and the last notes (the notes sued upon) were given to take up the first four. The first notes were made in the same form and with the same endorsements, with the exception of Mr. Hunter, who was not an endorser on the first notes which were given up.

At the time I delivered the four notes to Mr. Belcher, I had no claim against John B. Murison & Co., except I held some of their bank checks, which have been paid. * * * * *

When we were talking about loaning the Company the money, they, Murison & Co., made representations as to the solvency of the Chicago Refining Company, and stating their willingness to endorse their paper, and Mr. Murison stated to me that he thought them so entirely solvent that he had loaned them money belonging to his wife; I do not know that these statements amounted to any more on the part of Murison & Co., than the mere expression of their entire confidence in the solvency of the Refining Company; but the statement induced me to lend the money to the Company through them, on their endorsement on the paper. John B. Murison never entered into an obligation with me to endorse the paper of the Company, which might be issued in my favor.

The arrangement made with Mr. Belcher was not made by me, but

through Mr. Murison; I had a conversation with Mr. Belcher; I closed the transaction with Mr. Belcher, by taking four notes of $5000 each, due twelve months from the 20th July, 1861; they, the notes sued on, secured by twenty bonds of $1,000 each, issued by said Refining Company, and the endorsement of John B. Murison & Co.; said notes were made payable to the order of John B. Murison & Co., at the house of said firm in New Orleans. It was expressly understood that Murison & Co. should endorse the notes at the time they were taken. I think I am in error by stating the notes were payable to Murison & Co.; they may have been payable to E. S. Hunter; I am not certain as to the express agreement, as above stated, but there was a general understanding that Murison & Co. would endorse the notes; I take it for granted that they were to endorse the notes, from the fact that I stated to Mr. Belcher that I had not come to Chicago to go away with less security than I came with, and Mr. Murison was present at the time I made the remark. I believe this is all the understanding with Mr. Belcher, relative to John B. Murison & Co.; I obtained upon the new notes the security of E. S. Hunter and the security of the bonds; Mr. Hunter was not individually upon the old notes at the time I held the old notes. I held no bonds in my own right as security when I delivered up the old notes and received the new ones; Mr. Murison and Mr. Belcher were both present.

Question by defendants' counsel to this witness: At the time you stated that you did not wish to go from Chicago with less security than you came with, did or did not Mr. Belcher offer and give the notes endorsed by Hunter with the bonds?

The witness answers yes.

Question by defendants' counsel: Did or did you not receive from Mr. Hunter the notes endorsed by Belcher and the collateral after you had made this statement? This witness answers yes; at the time Belcher delivered the notes to me, the endorsement of Murison & Co. was not on them, but at that time I held the old notes in my hands.

Question: At the time you received the new ones of Belcher, was it not understood that the Company were entitled to a return of the old notes? Answer: I don't know what the Refining Company understood when they handed me the new notes; but it was not my understanding, nor my intention, to give up the old notes until I obtained the endorsement of Murison & Co. on the new ones. After the new notes were in my hands, I called on Mr. Murison, and obtained the endorsement of the firm.

Question: At the time, and previous to the endorsement of J. B. Murison & Co., what did Mr. Murison state to you? Answer: I don't like to endorse that paper, or I don't like to do this, speaking in an under tone; whereupon I replied to him: Very well, Mr. Murison, the old notes will do me, and then he endorsed them.

Question: Did or did not Murison say to you: Captain Allen, if I endorse these notes, you are not to hold me responsible? Witness answers:

No. After he had made the endorsement, he said to me: you must not hold me responsible, because, if I should have to pay them, it would ruin me. My reply was: Pshaw! Mr. Murison, you are always borrowing trouble and paying interest for it. This statement was made, when he immediately got up, after making the endorsement of this paper. This conversation was made to me in a low tone. Witness states that the notes in suit originate from a loan made by him to the Chicago Refining Company, made several years ago. * * * * * These notes were not, to the best of my recollection, payable to J. B. Murison & Co. I do not recollect if the first notes were endorsed by J. B. Murison & Co. These notes were renewed from time to time; I mean they were taken up by giving new notes, and finally merged in the notes in suit. * * * * * The first endorsement, whenever it was made, was made, I think, to facilitate the collection, at my request. It was not my understanding that Murison & Co. were not to be liable on their endorsement.

I do not know what Murison & Co. thought about their liability on their endorsements; but my understanding was, that they were liable for it. They had no express understanding as to the liability of Murison & Co. as endorsers. I did, to my recollection, in my intercourse and communications with Murison & Co., give them to understand that their names were on the notes simply for collection. I never paid them anything for endorsing the paper. I don't know that they ever derived any consideration from me, in any way, for the endorsement of any of these papers. * * * * Witness, being asked whether Murison did or did not endorse the notes in suit with the understanding that the firm would be held responsible, answered: There was nothing express one way or the other, by words, until he presented the notes for endorsement.* * * * * He endorsed the notes at my request.

Witness, being asked if he did or did not consider the endorsement of the old notes he gave to Belcher, as the ground for the endorsement of the notes sued upon? he answered: yes. He was also asked if there was any other consideration for the endorsement, by John B. Murison & Co., of the notes sued upon, to state that consideration. He answered: None that I know of. * * * * I never paid them anything for their endorsements. I sold the paper to Col. Butler, the plaintiff, for sixty cents on a dollar, interest off.

The plaintiff, having been interrogated on facts and articles, confessed that he had obtained the ownership to the notes, after they were due and protested, from Allen, about the first of November, 1862, for about sixty cents on the dollar.

It is shown that these notes were duly protested when due, on the 23d day of July, 1862, and the defendants were duly notified.

The plaintiff has, so far, established by his evidence, the liability of the defendants, as endorsers upon the notes in suit; we have now to examine the defence made, going to show that said defendants are not

liable to the plaintiff.

We must first see if Butler stands in a better position than Allen, his transferrer, would, if he were himself before the Court in this case. These notes were transferred to the plaintiff more than three months . after they had been due and protested, and this transfer, not being made in good faith, in the ordinary course of business, and before maturity, the notes carried with them, in tho hands of the plaintiff, all equities and defences that existed against Allen at the time of such a transfer. *Little* v. *Marshall*, 1 R. 51. It is a settled rule of commercial law, that whoever takes a note after maturity, takes it subject to the equities between the original parties, existing previous to notice of transfer, and acquires no better right than the transferrer had himself. 18 L. 119; 7 L. 118; 19 L. 472; 17 L. 152; 5 An. 153. The equities and defences that exist between Allen and Murison & Co. can now be set up against Butler, who stands in the lieu and place of his transferrer, Allen.

The evidence shows clearly that the defendants ondorsed the notes gratuitously and without any pecuniary consideration from any one, and at the instance and request of Allen, the original holder; that the makers never asked them to endorse the papers; that the old notes, in renewal of which the ones in suit were given, were endorsed by Murison & Co. at the request of Allen, to facilitate their collection. The evidence shows that Allen accepted the new notes in lieu and extinguishment of the old ones, with the security of Hunter as endorser, and twenty bonds of $1,000 each, as collateral security, and that there was not the slightest reference made to the endorsement of Murison & Co. upon the new notes; that the arrangement and settlement wore complete, the new notes were delivered to Allen, endorsed by Hunter and accompanied by the twenty bonds, Allen having yet in his hands the old notes; it was after all this that Allen went to Murison and obtained the endorsement of his firm upon the new notes, by making threats of the old notes and intimating that Murison & Co. were bound on the same; the evidence shows that the old notes, renewed by the ones in suit, had not been protested, and Murison & Co. were completely discharged, as endorsers, at the time; and nothing shows that Murison & Co. were advised and aware of their discharge; and it appears that on the contrary, they endorsed the new notes under the impression that they were still liable; and Allen was instrumental in holding them in that error. They then endorsed in the ignorance of their discharge. They were not then more bound to Allen by their endorsement, than they would have been to pay their own note, had they given one in ignorance of their discharge in payment of the notes so endorsed by them; even if they had paid the notes in that ignorance, they could have recovered back the money from Allen. 17 L. 386; 7 R. 334; 5 A. 12; 11 L. 16; 2 A. 824; 12 R. 231; 10 R. 40, 61. The commercial jurisprudence is settled upon that point, and if Allen were now plaintiff in lieu of Butler, he would not recover against these defendants.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be annulled, avoided and reversed. It is further adjudged and decreed, that our judgment be rendered in favor of the defendants, and that plaintiff pay costs in both Courts.

HOWELL, J., recused.